## COMMONWEALTH *vs.* KEVIN MANAGO.

No. 87-1239.

Suffolk.    April 13, 1988 — August 1, 1988.

Present: BROWN, KAPLAN, & WARNER, JJ.

*Robbery. Practice, Criminal,* Argument by prosecutor, Deliberation of jury,
    Question by jury. *Constitutional Law,* Self-incrimination.

At a criminal trial, remarks by the prosecutor in his closing argument could
    not reasonably have been interpreted by the jury as a comment on the
    defendant's not testifying in his own behalf. [265-267]
There was no merit to a criminal defendant's contention that the judge's
    instructions, in response to a question by the jury, on lesser included
    offenses, followed some six hours later by a *Rodriquez* instruction (*Com-
    monwealth* v. *Rodriquez,* 364 Mass. 87, 101 [1973]), in response to an
    indication from the jury of a deadlock, encouraged the jury to compromise
    on their verdicts. [267-268]
A criminal defendant's assertions on appeal, to the effect that the jury might
    have been inhibited by a remark from the judge that they should not
    speculate, were only conjectural. [268-269]
At the trial of an armed robbery indictment, evidence that the defendant
    had thrown the victim to the ground, gone through the victim's pockets,
    and had taken control of the victim's coins, keys, and license, was
    sufficient to prove the larceny element of the crime even though the
    victim was uncertain how many bills he had been carrying. [269]

INDICTMENT found and returned in the Superior Court De-
partment on January 15, 1986.

The case was tried before *Herbert Abrams,* J.

*Patricia A. O'Neill,* Committee for Public Counsel Services,
for the defendant.

*David B. Mark,* Assistant District Attorney (*Sharon B. Sof-
fer,* Assistant District Attorney, with him) for the Common-
wealth.

KAPLAN, J. Upon indictments of the defendant, Manago,
for armed robbery and for assault and battery with a dangerous

weapon, a jury returned a verdict of guilty of armed robbery and, in respect to the charge of assault and battery with a dangerous weapon, verdicts of guilty of the lesser included offenses of assault with a dangerous weapon and assault and battery. On the armed robbery conviction, the judge sentenced the defendant, a youth turned seventeen just before the date of the incident, to a ten-year term at M.C.I., Concord.[1] By consent, the judge placed on file the conviction of assault with a dangerous weapon. The conviction of assault and battery the judge treated as "surplusage."

The jury could have seen the facts roughly as follows. Around 8:00 P.M., November 13, 1985, Timothy M. Flynn, the victim, was walking down Massachusetts Avenue past St. Botolph Street in the South End district of Boston. He was going home to his place at 791 Tremont Street. As he passed or brushed by a man walking in the same direction, he heard the man muttering. He quickened his pace. The man overtook him, grabbed him by the right shoulder, turned him around, threw him to the ground, and got astride him. He had a brick in his hand and swung it.[2] The victim was not clear whether he was struck with the brick. The man "swatted" him perhaps four times with an open hand or fist, said, "Give it up; give up your fucking money," and went through his pockets. His glasses flew off, and his keys and license were cast to the side.

James Hayes, walking down Massachusetts Avenue, came upon the two on the ground. The man was holding the victim's head against a fire hydrant and striking him with a brick. Hayes called out, "What's going on?" The man, turning toward Hayes, answered, "What the fuck does it look like?" Instead of trying to intervene, Hayes ran around the men and further down Massachusetts Avenue a short distance to Wally's Cafe and made a "911" telephone call to the police. As Hayes came out

---

[1] It is assumed that if the defendant comports himself well, he may be relieved of imprisonment after one year.

[2] The incident occurred near the construction site for a subway station. The police found a brick at the place of encounter (it was introduced in evidence). This brick was separate and at some distance from a pile of bricks adjacent to the construction.

of Wally's, he saw the man fleeing down Massachusetts to Columbus Avenue.[3]

Hayes returned to the scene and assisted the victim in recovering his keys, license, and some coins scattered on the ground (additional coins were later recovered). The victim had a cut on the bridge of his nose and appeared shaken up, but came around quickly. Very shortly, a police cruiser appeared — the spot, more precisely, was 409 Massachusetts — and Officers Carl Nemes and Roy Sergei emerged. The victim told the officers his assailant was a young black man, about as tall as the victim (six feet, one inch), or a couple or three inches less, stockier than the victim (then weighing 135 pounds), wearing a waist length grayish bluish jacket, perhaps of leather or vinyl, and light colored pants; under the jacket (partly open), a sweatshirt. Hayes described the man as black, young, about Hayes's height (five feet, ten inches), wearing a black or dark blue jacket or top garment, and white sneakers.

The officers radioed a description and invited the victim to get into the cruiser to make a quick tour of the neighborhood in hopes of sighting the assailant. The cruiser proceeded down Massachusetts, turned right on Columbus, left on Northampton Street, and right on Tremont to Shawmut. A radio message directed the cruiser to 521 Massachusetts (about 350 yards from 409). One or two police cars, two or more officers, and others, including the defendant, were at the location as the cruiser arrived. Probably an observer could surmise that it was the defendant who was the cause or nub of the gathering.[4] The victim first said the defendant was not wearing the jacket. He then identified him firmly as the assailant. Hayes, who had walked down to 521, also made a definite identification.[5] The

---

[3] Street lights were adequate for observation here as well as at the scene.

[4] Trial was preceded by a voir dire on motion to suppress on the ground that there was undue suggestiveness in the identifications at 521. The motion failed, and no point is made of this on the present appeal. Of course the defendant urged the point on the jury.

[5] The victim had concentrated on the assailant's face. In a previous mugging he had failed to do so and was unable to make an identification; he resolved not to make that mistake again. The victim's glasses corrected for

defendant was arrested; the time was 8:15. He was wearing a blue sweatshirt (with hood and pouch) and light colored pants. On his person were found five one-dollar bills.[6]

The foregoing draws on the testimony of the victim, Hayes, and officers Nemes and Sergei, the witnesses called by the Commonwealth. The defense called Clara Manago, the defendant's mother, residing at 99 Camden Street. She testified she was awakened by the sound of the slamming of the door of her apartment at 7:58 P.M. (by the clock) on November 13, which she took to mean that her son was leaving. She said he called from the police station between 8:15 and 8:20 (again by the clock). There was evidence that such a call, ordinarily allowed after booking, would not have been made before 8:30.[7] The witness said her son did not have a jacket; also that perhaps about 6:00 P.M. she had given him two dollars to add to his three to buy a sandwich and soft drink.[8] It is fair to say that this witness appeared very weak under cross-examination.

1. Defense counsel, in closing to the jury, remarked that although the victim was an honest man and was sure of his identification, he might be — and the defense was arguing that he was — mistaken. And a similar suggestion could be made about the witness Hayes. The prosecutor, in his closing argument, responded: "What have you heard that could suggest they are making an honest mistake? I suggest you haven't heard anything that would suggest it was an honest mistake.

---

astigmatism and trouble with distant vision, but he testified he had no difficulty at close range without the help of his glasses.

The victim identified the defendant at trial. Hayes did not, but his identification on November 13 of course was probative.

[6] The victim thought originally that the assailant took five singles but later he was uncertain. The uncertainty began with the amount he had as he left work in Harvard Square, Cambridge, and started his walk home. He had a ten-dollar bill but may have had more. At a bar near the campus of the Massachusetts Institute of Technology (before crossing the Harvard bridge) he had two (possibly three) beers and bought a pack of cigarettes. When he got home after the incident he had three dollars in his pocket.

[7] Time factors according to police testimony were: 8:07, received radio call to go to the four hundred block on Massachusetts; stayed to 8:09 or 8:10 at scene; drove about to 8:13; arrest, 8:15; booking, 8:30.

[8] Police testimony suggested that if the defendant was headed for the sandwich store at 7:58 he would not have been at the location where and when he was picked up.

They're both [the victim and Hayes] absolutely certain." The prosecutor went on to try to show that the identifications were solid.

The defense contended that the prosecutor's remark about "[w]hat have you heard" was a foul blow because, according to the defense, it directed the jury's attention to the fact that the defendant had not taken the stand. This seems to us a manifest distortion; it is unlikely in the extreme that a jury would be led by the remark to an invidious reflection about the defendant's silence.[9]

A prosecutor is entitled to urge upon the jury the strong points in the Commonwealth's submission as well as the weak points in the defendant's submission, and is not to be barred from doing so by some apprehension that his speech may give rise to a passing or indirect or collateral reflection upon what the defendant might have said if called. The opposite extreme is reached "where a prosecutor, in lieu of saying in terms that the defendant has failed to testify, remarks archly that the Commonwealth's case has not been answered or remains un-contradicted, when it is apparent that a response must have come, if at all, from the defendant." *Commonwealth* v. *Sherick*, 23 Mass. App. Ct. 338, 343-344, *S.C.*, 401 Mass. 302, 304 (1987). The issue may be put thus: "[I]t is not in every case where the fact of the silence is in some way referred to that the privilege [against self-incrimination] is abused. Indeed, in many situations it is not possible for a prosecutor absolutely to skirt the fact." We ask "whether the jury's attention is being directed to the defendant's silence or failure to produce evidence as the basis for the prohibited inference, or is rather directed to a different matter, with the silence, in the rather unlikely event it draws any attention, being sensed as collateral

---

[9] Discussing where the defendant was when stopped, the prosecutor said, "Defense counsel suggests, why wouldn't he have just gone home, or whatever, after. Who knows what he was out there doing, ladies and gentlemen . . .. Why would he be walking down here if he is going there to a sub shop?" (See note 8, *supra.*) The defense contended that this similarly highlighted unfairly the defendant's failure to testify, but again we think the argument was much overdrawn.

or incidental." 23 Mass. App. Ct. at 344 (footnote omitted). Cases on either side of the line are assembled at 23 Mass. App. Ct. at 343-346. Compare *Commonwealth* v. *Storey,* 378 Mass. 312, 323-324 (1979), cert. denied, 446 U.S. 955 (1980); *Commonwealth* v. *Ferreira,* 381 Mass. 306, 315 n.13 (1980).

On the assumption that the prosecutor's remarks were on the wrong side of the line and prejudicial, the defense complained that the judge's instructions were not strong enough to overcome the prejudice. We reject the assumption. At all events the judge charged on the presumption of innocence, proof beyond a reasonable doubt, and the defendant's right to remain silent without raising any inference of guilt. He did not use the defendant's proposed form of words, but the substance was similar. See *Commonwealth* v. *Kelley,* 359 Mass. 77, 92 (1971). Cf. *Commonwealth* v. *Thomas,* 400 Mass. 676, 679-680 (1987). Contrast *Commonwealth* v. *Domanski,* 332 Mass. 66, 70-71 (1954).[10]

2. After deliberating briefly, the jury asked a question which resulted in a charge, in effect, that assault with a dangerous weapon could serve as a lesser included offense under the indictment for assault and battery with a dangerous weapon.[11]

After about three hours of deliberation, the jury reported difficulty in reaching decision, and the judge encouraged them to deliberate further.

After about six hours and indications from the jury of a deadlock, the judge gave the jury the *Rodriquez* instruction (*Commonwealth* v. *Rodriquez,* 364 Mass. 87, 101 [1973]).[12]

---

[10] The defendant notes that the judge did not say (as the defense proposed) that a defendant might have many reasons for declining to become a witness. Without further elucidation (which was not proposed) the statement does not come to much, and might, indeed, work marginally against a defendant.

[11] In response to another question, the judge charged that they were not controlled by the amount of five dollars laid in the indictment for armed robbery.

[12] The judge followed the model *Rodriquez* instruction, but, while stating that the burden of proof was on the Commonwealth, he did not charge on the effect of reasonable doubt. He had, however, covered the point in his previous instructions. See *Commonwealth* v. *Sellon,* 380 Mass. 220, 233-234 (1980).

He added that there were two indictments and it was possible for the jury to reach a (unanimous) verdict on one but not on the other. This was correct, see, e.g., *United States* v. *DiLapi*, 651 F.2d 140, 146-147 (2d Cir. 1981); cf. *Commonwealth* v. *Diaz*, 19 Mass. App. Ct. 29, 33 (1984), but the defendant suggests that the charge, although merely informative on its face, could have encouraged the jury to yield to compromise and bring in a "partial" verdict on one indictment not on their true view of the merits but in order to resolve their own differences and to please the judge. This perhaps overestimates the suggestibility of the jury. It may be enough to say that the jury in the end did not bring in a partial verdict but rather a verdict of guilty on the indictment for armed robbery and verdicts of lesser included offenses under the indictment for assault and battery with a dangerous weapon.

After the *Rodriquez* charge, the jury returned with a question, "Does a person have to be arrested before that person is brought to a police station, or can that person be merely a suspect in order for that person to be brought to the police station?" [13] The judge indicated that there might be circumstances in which a suspect could be brought to a police station without having been previously arrested, but he said that here there was a previous arrest; the question appeared irrelevant; and the jury should not engage in speculation. [14] The defense objected that the negative remark about speculation might inhibit the jury from considering whether the identifications took place in circumstances affecting their reliability. This objection was indeed speculative; and we note that the judge had already given the model charge on the evaluation of evidence bearing on identification. The defense now suggests that a jury, told that one of their questions was irrelevant, might feel awkward about asking another, or be cowed or embarrassed into finishing the case

---

[13] "In other words," the question went on, "is it legal for a suspect who has not been identified by the victim to be taken to the police station?"

[14] At the end of this charge, the foreman remarked, "The question arose not out of what are the facts of the case, but it arose out of speculation as to possible alternative ways of following up after the police stopped suspects."

with a verdict. This observation, besides being conjectural, may underrate the sangfroid of an average jury.

3. The defendant has not disputed that the verdict is supported by the evidence beyond a reasonable doubt, except for a pass at arguing that there should have been a required finding on armed robbery because the victim was finally doubtful about how many bills he was carrying at the time of the attack. There was plenty of evidence that the defendant went through the victim's pockets and took control of the defendant's coins, and keys, and license. (Had Hayes not appeared the defendant might have acted more deliberately.) This exertion of control over the victim's property was itself sufficient to supply the larceny element of the robbery. See *Commonwealth* v. *Luckis*, 99 Mass. 431, 433 (1868); *Commonwealth* v. *Flowers*, 1 Mass. App. Ct. 415, 418 (1973); *Commonwealth* v. *Bradley*, 2 Mass. App. Ct. 804, 805 (1974).

*Judgment affirmed.*