COMMONWEALTH *vs.* AUGUSTINE PETRILLO.

No. 98-P-1368.

Suffolk. March 14, 2000. - September 20, 2000.

Present: GREENBERG, KAPLAN, & SMITH, JJ.

*Rape. Evidence,* Videotape, Relevancy and materiality, Corroborative evidence, Inflammatory evidence. *Error, Harmless. Practice, Criminal,* Harmless error, Duplicative convictions.

At the trial of indictments for aggravated rape, kidnapping, and threats, the judge erred in allowing the jury to view sixteen minutes of a sexually explicit commercial videotape, found in the defendant's apartment, where the videotape was of marginal relevance, added little to the victim's testimony, and was inflammatory [108-109]; the error was harmless, however, in light of the strong evidence against the defendant, the individual voir dire of the venire on the subject, and the judge's ameliorative instructions [109-110].

A conviction for kidnapping was duplicative of a conviction for aggravated rape based on kidnapping, in circumstances in which the jury returned a general verdict. [110-111]

INDICTMENTS found and returned in the Superior Court Department on March 22, 1996.

The cases were tried before *E. Susan Garsh,* J.

*Douglas J. Beaton* for the defendant.

*Alex Philipson,* Assistant District Attorney, for the Commonwealth.

GREENBERG, J. Over the defendant's objection at his jury trial on six counts of aggravated rape, kidnapping, and other related crimes,[1] the trial judge permitted sixteen minutes of commercial, hard-core, pornographic videotapes to be shown to the jury. After a five-day trial, the defendant was convicted of single counts of aggravated rape, kidnapping, and having threatened to

---

[1]The other crimes were indecent assault and battery on a person over fourteen; two counts of assault and battery by means of a dangerous weapon; two counts of assault and battery; and one count of threatening to commit a crime.

commit a crime.[2,3] He was acquitted on all other charges. On appeal, the defendant argues that the showing of the videotapes constituted prejudicial error that denied him a fair trial. Although we agree that the videotapes should not have been played to the jury, we affirm two of the convictions because, under the circumstances presented here, the error was harmless.

1. *The sexual encounters.* The victim, a twenty-four year old Spanish-speaking immigrant from the Dominican Republic, met the defendant sometime in the fall of 1995. She thought he could help her learn English, find work, and gain independence from her mother. She began dating him and moved into his rooms at the Winthrop Arms Hotel, a residential hotel in Winthrop. At first the relationship was amicable, but within several weeks, things turned sour. The defendant began to mistreat her: forcing her to have sex with him with a pillow over her head, threatening her with knives, and confining her to the apartment for prolonged periods were prime examples. She remained with him until February 22, 1996. The manager at Service Master, where the defendant and the victim worked as house cleaners, suspected something was wrong. She offered to help the victim and to call the police, but the victim refused.

The victim testified that, between the 19th and the 22nd of February, the defendant would truss her up with duct tape and force her to have vaginal, anal, and oral sex. She also testified that the defendant "grabbed me and put me across his knees and hit me on my butt," and that she was required to perform "from behind," as well as lying on her back with her legs above her head. During these sessions, the defendant played pornographic videotapes, and the victim testified that he would do "everything that was on the videos," plus "other things that were his own things."[4]

The Commonwealth rested upon the testimony of the victim and several other witnesses who corroborated some aspects of her testimony as to what was going on inside the apartment at

[2]At the close of the Commonwealth's case, the judge granted the defendant's motion for entry of a finding of not guilty on one of the assault and battery charges.

[3]The conviction for having threatened to commit a crime was initially placed on file, but subsequently was brought before the court.

[4]The conduct depicted in the films includes several different fairly conventional, if unusually vigorous, acts of sexual intercourse. No elements of force, violence, or coercion in any form appear in the videotapes.

the Winthrop Arms. One witness who lived across the street from the hotel testified that, on February 22nd, after the victim fled from the apartment, he found her hiding behind a car in his driveway, somewhat hysterical and disoriented. He took her to the Winthrop police station where she spoke to several officers about her plight. On February 28, 1996, the police obtained a search warrant for the defendant's hotel room and recovered, among other things, the two videotapes at issue.

The defense called nine witnesses, attempting to weaken the case-in-chief by reference to certain incidents when the victim was free to escape or to ask for help but failed to do so. The defendant did not testify, but through other witnesses denied all criminal wrongdoing and suggested that he only had consensual sex with the victim. The testimony of these witnesses and the cross-examination of some of the Commonwealth's witnesses provided some basis for the suggestion (which the jury rejected) that the victim was lying about the abuse because the defendant was not living up to his promise of financial assistance.

2. *The pornographic videotapes.* On the first day of trial, before the victim took the stand, the judge heard a motion in limine on the admissibility of the pornographic videotapes. The Commonwealth's offer of proof was that the victim "will testify that she was forced to watch these two tapes" and that "the acts that are in the tapes correspond to the victim's testimony . . . that she was forced to watch these tapes and then commit the acts." Defense counsel objected, arguing among other things that the tapes included footage of sexual activities that had no bearing on the case and that, "in essence, these actors are going to be acting out a story for her, in place of her testimony." In particular, defense counsel claimed that the sexual scenes were not unique enough to prove modus operandi,[5] nor were they probative of anything more than the fact that the victim had seen the tapes: she would testify that x, y, and z were on the tapes, and then the tapes would be played, demonstrating that she knew what was on them. As for the proposition that she had been forced to emulate the sexual acts in question, however, showing the tapes would accomplish nothing. On the other hand, defense counsel continued, the material was highly inflammatory and, if shown, would deprive the defendant of a fair trial. The judge took the motion under advisement pending the

[5]While true, this is a straw man, since the Commonwealth never sought to introduce the tapes on this ground.

victim's testimony and a prescreening of the tapes. As a precaution, she informed the potential jurors at voir dire about the sexually explicit nature of the expected evidence. Questioned individually, all who indicated that such evidence might be so discomfiting as to interfere with their ability to heed the evidence and discuss it with fellow jurors at deliberations were excused.

After the victim's testimony, the judge observed the videotapes herself and ruled that sixteen minutes could be shown to the jury. Those sixteen minutes depict conduct that the victim was allegedly forced to reenact during the February 22nd rape. Before publishing the chosen portions to the jury, the judge gave a limiting instruction. She stated: "First of all, it is not illegal to possess or to view such videos, and nothing depicted on the films is illegal, and the persons on these films have no connection to this case. You may not consider possession or viewing of such films as proof that the defendant has a bad character, and you may not use this evidence to conclude that if the defendant possessed or used such films he must have committed the crimes charged. If the Commonwealth proves that these films were being played during the acts alleged to constitute the aggravated rapes charged in the indictments, then and only then may you consider such evidence as to the circumstances and conditions existing at the time of the alleged acts as you may find such circumstances and conditions to be relevant on the issue of the defendant's state of mind during the time of the alleged acts. You may also consider such evidence as corroboration of [the victim's] testimony with respect to the films only." The defendant objected to the state of mind reference, and the objection was overruled. The tapes were shown to the jury, after which defense counsel moved for a mistrial "on the grounds that the tapes which were just played for the jury are so inflammatory and prejudicial" that the jurors could not be expected to evaluate the evidence fairly. The judge denied that motion as well. At the end of the trial, the judge reminded jurors to consider evidence only for the purposes for which it was admitted.

To be admissible, evidence must meet "the threshold test of relevancy," that is, it must have a "rational tendency to prove an issue in the case." *Commonwealth* v. *Fayerweather*, 406 Mass. 78, 83 (1989), quoting from *Commonwealth* v. *LaCorte*, 373 Mass. 700, 702 (1977). Although "[e]vidence need not

establish directly the proposition sought," *Commonwealth* v. *Tobin*, 392 Mass. 604, 613 (1984), it "must . . . render[] the desired inference more probable than it would have been without it," *Commonwealth* v. *Fayerweather, supra,* quoting from *Commonwealth* v. *Copeland,* 375 Mass. 438, 443 (1978). See *Commonwealth* v. *Gordon,* 407 Mass. 340, 351 (1990).

The government's initial rationale for having the jury view part of the tapes was that the sexual conduct shown on them corresponded to the acts the victim said she was forced to emulate; in other words, the tapes were corroborative of her testimony. See *Commonwealth* v. *Halsey,* 41 Mass. App. Ct. 200, 203 (1996). During the hearing on the motion in limine, the prosecutor argued that the tapes depicted the acts to which the victim would testify: oral, anal, and vaginal intercourse; some scenes depicting what might be called a "rear entry" position; an instance of vaginal intercourse with the woman's legs above her head; and an instance of spanking. As it turned out, the victim's testimony on these subjects was less explicit than billed and, perhaps consequently, less than explicitly tied to the contents of the videotapes.

Even if showing the tapes corroborated some of the details of her testimony, however, unlike the cases cited in the government's brief,[6] their relevance was marginal. In the circumstances of this case, the videotapes had no bearing on whether the defendant's carnal knowledge of the victim was consensual. The defendant did not contest either having had sex with the victim or having watched the videos with her.

The second rationale for admitting the tapes was that they were part of the conditions existing at the time of the acts alleged in the indictments and therefore helped to "show the whole transaction of which the crime was a part . . . giving [the jury] the complete picture." *Commonwealth* v. *Durkin,* 257 Mass. 426, 428 (1926) (citations omitted). Where the circumstances of the alleged crime are intelligible without viewing the

---

[6]The cases relied upon by the government are distinguishable because the victim in each instance was a child. The relevancy of the evidence in those circumstances was clear. See, e.g., *Commonwealth* v. *Lanning,* 32 Mass. App. Ct. 279 (1992); *Commonwealth* v. *Halsey,* 41 Mass. App. Ct. 200 (1996); *Commonwealth* v. *Holloway,* 44 Mass. App. Ct. 469, 475-476 (1998); *People* v. *Allison,* 115 Ill. App. 3d 1038, 1044 (1983); *Clifford* v. *State,* 474 N.E.2d 963, 972 (Ind. 1985). Additionally, in the Massachusetts cases cited, the offending videotapes were not shown to the jury; instead, there was simply testimony concerning the possession and/or playing of the tapes.

offending material, however, that rationale does not apply. *Commonwealth* v. *Yelle*, 19 Mass. App. Ct. 465, 471 (1985). The graphic display of actors added little to the victim's direct testimony of her sexual relations with the defendant and could only inflame the jury against the defendant as a generally lewd person. See *Commonwealth* v. *LaSota*, 29 Mass. App. Ct. 15, 26-27 (1990).

We next consider the whole record, and "by weighing the prejudicial effect of the improper evidence," determine whether the error was harmless. *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696 (1983). *Mahdi* suggests several factors, among them the relationship between the evidence and the defense theory of the case, the weight of the evidence against the defendant, and the availability of curative instructions. *Id.* at 696-697.

Evidence that the victim has seen two of the defendant's pornographic videos is less than devastating to the defense theory of the case. In fact, it is consistent with the premise of the defense: that they enjoyed a consensual sexual relationship, which included watching sexually explicit films together. The evidence against the defendant was strong. Rosann Tuttavilla lived directly across the hallway from the defendant's rooms and testified that she knew both the defendant and the victim. On February 22, 1996, she heard the defendant banging and yelling in the hall, and the victim's "trembling" voice inside the defendant's apartment. Shortly thereafter, the victim fled and was found by another neighbor, as we have recounted, in a distraught condition and taken to the police station. At the station, a registered nurse performed an examination of the victim and seminal fluid was found through vaginal smears and swabs. The judge gave a limiting instruction concerning the videotapes which, though not entirely correct, to a large degree ameliorated the erroneous admission of the evidence.

In addition, the tameness of the film footage at issue "did not depict the defendant as particularly depraved." *Commonwealth* v. *Halsey*, 41 Mass. App. Ct. at 204. It is hard to think that the members of the jury were likely to be swayed by looking at sixteen minutes of these particular pornographic videotapes, especially in light of the careful, individual juror voir dire that the judge took pains to conduct before the trial began. Finally, and perhaps most important, the defendant was acquitted of all but three of the charges save the one count of aggravated (vaginal) rape, suggesting that the viewing of the tapes did not

have a prejudicial effect on the jury. See *Commonwealth* v. *Sosnowski*, 43 Mass. App. Ct. 367, 372 (1997) (difficult to find prejudice where jury returned not guilty verdicts on two of three rape indictments).

The judge instructed the jury that they could consider the videotapes as corroboration of the victim's testimony about the defendant's state of mind. The defense objected to the reference to the defendant's state of mind, and, on appeal, argues, quoting from *State* v. *Coe*, 101 Wash. 2d 772, 778 (1984), that evidence of "lustful disposition" has "no bearing on any element of the charges." While the objection is well taken, the defendant's characterization of its effect "perhaps overestimates the suggestibility of the jury." *Commonwealth* v. *Manago*, 26 Mass. App. Ct. 262, 268 (1968). It is sufficient to point out that the jury acquitted the defendant of nine of the twelve charges under their consideration.

3. *Duplicative convictions.* The defendant argues that the convictions for aggravated rape on the basis of kidnapping and kidnapping are duplicative. We agree. The kidnapping indictment charges that the defendant committed that offense "on diverse dates exact dates unknown from February 19, 1996 and February 22, 1996." The judge's instruction correctly provides that one element of the crime of aggravated rape is the offense of kidnapping. The jury found the defendant guilty of the crime of aggravated rape on February 22. To have found the defendant guilty of aggravated rape on that date, the jury of necessity also found that he committed the crime of kidnapping on that date.

In defining the crime of kidnapping, the judge instructed the jury, "It's not necessary for the Commonwealth to prove or for you all to be agreed that the defendant committed the offense of kidnapping more than once, but in order to find the defendant guilty of kidnapping, you must be unanimously agreed that the Commonwealth has proved that the defendant committed that crime at least once."

In defining the crime of aggravated rape, the judge stated, "Finally, the Commonwealth must prove beyond a reasonable doubt that the rape was committed during the commission of the crime of kidnapping. I've already explained to you the elements of the offense of kidnapping, and you should apply those instructions in your consideration of the fourth element of the offense of aggravated rape." Although there was sufficient evidence from which the jury could have found the defendant

guilty of a separate offense of kidnapping, "we need not determine whether there was any other evidence which would support two distinct acts, since the judge did not instruct the jury that the conviction[s] must be based on separate acts." *Commonwealth* v. *Juzba*, 46 Mass. App. Ct. 319, 325 (1999). Because there was a general verdict and we consequently cannot surmise whether the jury found the defendant guilty of kidnapping on the basis of facts that were separate and distinct from those which underlay the finding of the element of kidnapping that was a part of the conviction for aggravated rape, we must vacate the conviction for kidnapping. See *Commonwealth* v. *Kickery*, 31 Mass. App. Ct. 720 (1991); *Commonwealth* v. *Houston*, 46 Mass. App. Ct. 378, 383 (1999), *S.C.*, 430 Mass. 616, 617 (2000).

The judgments on aggravated rape and threatening to commit a crime are affirmed. The judgment on the kidnapping charge is reversed, the verdict thereon is set aside, and that indictment is dismissed.

*So ordered.*