COMMONWEALTH *vs.* JOHN CAREY.

No. 09-P-1832.

Essex. December 1, 2010. - May 26, 2011.

Present: MILLS, GRAINGER, & FECTEAU, JJ.

Further appellate review granted, 460 Mass. 1111 (2011).

*Armed Home Invasion. Homicide. Attempt. Assault and Battery. Consent.*
*Evidence,* Photograph, Videotape, Information stored on computer, Prior
misconduct, Inflammatory evidence.

At the trial of indictments charging, inter alia, armed home invasion and as-
sault and battery by means of a dangerous weapon, the judge did not err in
declining to give an instruction that consent was a defense to those charges,
where Massachusetts does not recognize an individual's ability to consent
to such violence that bodily harm is likely to result, and where the defend-
ant's conduct did not involve a constitutionally protected liberty interest.
[591-592]

At the trial of indictments charging attempted murder by strangulation, armed
home invasion, assault and battery by means of a dangerous weapon, and
assault and battery, the judge did not abuse his discretion in admitting in
evidence pictorial images of strangulation and related material that police
officers found on the defendant's computer, testimony regarding the offi-
cers' discovery of computer entries and files related to asphyxia and articles
and Web sites relating to strangulation, or a video "clip" showing a man
strangling a naked woman until she appeared to have died, where the
evidence was highly probative on the issue of the defendant's motive and
intent, the number of exhibits was limited, and the judge gave strong
cautionary instructions on four distinct occasions. [592-596] GRAINGER, J.,
dissenting.

INDICTMENTS found and returned in the Superior Court Depart-
ment on July 23, 2007.

The cases were tried before *Richard E. Welch, III*, J.

*James L. Sultan* for the defendant.

*Kenneth E. Steinfield*, Assistant District Attorney, for the
Commonwealth.

FECTEAU, J. The defendant, John Carey, appeals from his convic-
tions of armed home invasion, assault and battery (two of three

counts), and attempting to murder the victim by strangulation.[1] He contends, pursuant to the holding of *Lawrence* v. *Texas*, 539 U.S. 558 (2003), that the judge committed constitutional error by refusing to provide an instruction that the jury consider whether the alleged attack was part of consensual sexual activity, which, if found, mandated his acquittal on the charge of attempted murder by strangulation. He also complains of the prejudicial admission in evidence of sexual and violent images and related material taken from his computer. We affirm.

*Background.* The following facts were developed at trial. In the spring of 2007, the fifty-five year old victim lived in Hamilton with her twelve year old son. She and her husband were separated, with her husband living in an apartment in Arlington; they were in the process of reconciling. The defendant lived in Braintree with his girlfriend. His ex-wife lived in Hamilton, one street over from the victim's house, and was a friend of the victim. The defendant and the victim's husband were acquainted through their common interest in golf, and the defendant had assisted the victim's husband with projects at the victim's home.

On June 6, 2007, about 9:40 P.M., the victim was in the kitchen, working on her son's school project, when she heard a knock on the sliding glass door separating the "kitchen area" from a rear deck. Thinking it was her husband, who had just left to return to his apartment, she walked toward the door; recognizing the defendant, whom she knew as her friend's ex-husband and her husband's golf acquaintance, she opened it. The defendant entered and asked where her husband was.[2] The victim, who had returned to the kitchen, said that he was not there; the defendant then responded aggressively, "Why would he invite me over for a drink if he's not here?" Not knowing the answer, and frightened by his tone, she suggested they call her husband,

---

[1]The grand jury indicted the defendant for (1) attempted murder by strangulation (G. L. c. 265, § 16); (2) armed home invasion (G. L. c. 265, § 18C); (3) assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A[b]); and (4) assault and battery (two counts) (G. L. c. 265, § 13A).

[2]There was evidence from the victim's husband that he and the defendant had spoken by cellular telephone just prior to the events in question, during which the victim's husband had told the defendant that he was on his way back to his apartment.

but the defendant declined. According to her, the defendant looked "awful, . . . drunk, . . . and scary," and his breath smelled of alcohol and his eyes were red. His speech was responsive and intelligible, however, and he seemed to have no problem walking. Wanting the defendant to leave, she told him she had to finish a project, walked to the sliding glass door, and opened it for him to leave. He did not leave; instead, facing the victim, he took a necktie that he had brought with him, put it around her neck, and began to pull the ends. The victim managed to get her hands between the tie and her throat. The defendant continued to pull the "noose" tightly around her neck and kicked her legs. She moved backwards as they struggled and knocked over a heavy chair. Thinking that she was going to die, she fell to the floor, with the defendant continuing to pull "harder and harder."

As she lapsed into unconsciousness, she heard her son run downstairs. He had been changing his clothes in his second-floor bedroom and ran down when he heard screaming, someone saying "help," and the crashing of furniture. When he reached the first floor, he saw the defendant choking his mother with his hands crossed and near her neck, and holding and pulling something. His mother was on the ground, screaming and trying to get away from the defendant. When her son yelled, "What are you doing?" the victim told him to get a knife and stab the defendant. He got a knife from the kitchen and stabbed the defendant in the back; the blade broke and fell to the floor. He then dropped the knife handle, grabbed the defendant, and tried to punch and pull him away from his mother.

The defendant continued to strangle the victim, and at some point, he released his choke hold and ran after the son, but returned to the victim when he saw that she had regained her footing. He then punched her in the forehead and mouth. Still screaming, she ran out the sliding glass door to the back yard, followed by the defendant and her son. Once outside, the victim ran to the home of neighbors to one side and her son ran to other neighbors. The defendant got into his car (parked in her driveway) and drove off.

The victim sustained wounds to her forehead and above one eye, and displayed red abrasion marks on her neck that became

more pronounced over time.[3] Her hands were also red and swollen. She realized at the neighbor's home that she had soiled herself during the attack.

The neighbor called the Hamilton police a minute or two after the victim arrived, and at 9:50 P.M., Officer Arthur Hatfield was dispatched. In the victim's home, the officer noticed signs of a struggle, including a tipped-over chair, a knife blade on the floor, a rug out of place, what appeared to be urine on a sandal, and a wall telephone receiver hanging off the hook.

Later, Hatfield and other members of the Hamilton police department conducted further investigation at the victim's home and found, among other evidence, a piece of a necktie on a step leading up to the deck behind the house. The victim had never seen the remnant, which was of the "thin portion" of a man's tie, almost thirty inches long, cut on one end and with a rip in the center. A deoxyribonucleic acid (DNA) analyst testified that hairs found on the tie matched the victim, and that "handler DNA" on the tie was a mixture from at least three people, including the victim and the defendant but excluding the victim's husband and son. Prior to the attack, the victim had never had any problems with the defendant nor an intimate relationship with him.

As part of their investigation, State police conducted a forensic examination of the defendant's computer. State police Sergeant Thomas Neff found "400 or more" photographs "that were strangulation-oriented or had strangulation themes." Of these, eight were offered and received in evidence.[4]

Sergeant Neff also searched the defendant's computer for the term "asphyxia" and found 978 "hits" and forty-seven files. One of the searches resulted in a link to an article, accessed by the defendant, about a man suspected in a "ligature strangulation" murder whose previous convictions of four strangulation murders twenty years earlier had been reversed on appeal. Sergeant Neff also located "remnants" of ten or so other articles and Web sites involving strangulation.

---

[3]An emergency medical technician testified to seeing severe, swollen ligature marks around the victim's neck.

[4]The defendant included in the record appendix all fourteen pictures submitted by the Commonwealth with its motion in limine to admit such evidence. As noted, only eight were offered and admitted at trial.

Lastly, the sergeant found a ninety-second video "clip" in the "my documents" folder on the defendant's computer. The clip was played for the jury. In it, a man strangles a naked woman until she appears to have died.

*Discussion.* 1. *Consensual sexual activity as a defense.* The defendant testified, and his counsel argued, that the defendant's intent was not to kill the victim but to have sex with her, that his interest in sexual asphyxiation did not mean that he wanted to kill her, and that the events on the evening in question, including their "asphyxiation activities," were consensual. According to the defendant, they had engaged in similar activity on two prior occasions. He contends, therefore, that the judge should have instructed the jury that consent was a defense to the charges of armed home invasion and assault and battery by means of a dangerous weapon. The defendant neither requested such an instruction nor objected when the judge did not so instruct, both during the main portion of his instructions and in answer to specific jury questions. As the case on which the defendant relies, *Lawrence* v. *Texas*, 539 U.S. 558 (2003), does not overrule existing Massachusetts precedent that consent is not a defense to harmful conduct, we hold that the instruction was not required.

Massachusetts, like most States, does not recognize an individual's ability to consent to "such violence that bodily harm is likely to result." *Commonwealth* v. *Appleby*, 380 Mass. 296, 311 (1980), quoting from *Commonwealth* v. *Farrell*, 322 Mass. 606, 620 (1948). In such circumstances, "consent . . . is immaterial." *Ibid. Appleby* involved beatings that the defendant claimed were requested by the victim for the purpose of sexual gratification. *Id.* at 301. The immateriality of consent under such circumstances is a principle both long-standing and recently reasserted. See, e.g., *Commonwealth* v. *Parker*, 9 Met. 263, 265 (1845); *Doe* v. *Moe*, 63 Mass. App. Ct. 516, 521 n.7 (2005) ("one cannot, as a matter of public policy, consent to becoming the victim of an assault and battery by means of a dangerous weapon in the course of a sexual relationship").

The defendant asserts, however, that this rule does not survive constitutional scrutiny in the aftermath of the United States Supreme Court's decision in *Lawrence* v. *Texas*, *supra.* In

*Lawrence, supra* at 578, the Court overruled its decision in *Bowers* v. *Hardwick*, 478 U.S. 186 (1986), holding that liberty interests gave substantial protection to adults in the conduct of their private lives and that the due process clause of the Four- teenth Amendment to the United States Constitution provided the petitioners "the full right to engage in their conduct without intervention of the government." The defendant here asserts his conduct is no less protected from criminalization than the behavior considered in *Lawrence.*

The violent and physically harmful nature of the defendant's acts defeats his argument — an argument among several anticipated and rejected by the language of *Lawrence* itself: "The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused." *Ibid.* In sum and in the context of the due process clause, there is a legitimate societal and governmental interest in prohibiting violent and physically harmful acts, a prohibition that does not apply to private consensual behavior involving neither injury nor coercion.[5]

2. *Admission in evidence of photographs, video, and computer search records.* As narrated above, eight of the more than 400 pictorial images of strangulation and related material that State police discovered on the defendant's computer were admitted in evidence. The police testified regarding their discovery of 978 entries and forty-seven files related to "asphyxia," and remnants of ten additional articles and Web sites relating to strangulation. As also mentioned, the ninety-second video clip, showing a man strangling a naked woman until she appears to have died, was played for the jury.

The defendant asserts that these graphic materials were of negligible relevance but highly prejudicial and that their admis- sion was a clear abuse of discretion and constituted error, whether considered as highly inflammatory or as bad act evidence.[6] The judge made a finding on the record that the

---

[5]We acknowledge the Commonwealth's argument that the defendant failed to preserve this issue below; since we conclude that there was no error, we do not address the standard of review.

[6]During the hearing on the motions in limine, the parties referred to this evidence as "prior bad act" evidence, which, like gruesome or potentially

prejudicial impact of the evidence was outweighed by its probative value.[7]

Our case law has traditionally examined the admission of such evidence, including the evidence of which the defendant here complains, under a standard that recognizes that "[t]he fact that photographs may be inflammatory does not render them inadmissible if they possess evidential value on a material matter. . . . The determination whether a photograph possesses such value is within the discretion of the trial judge." *Commonwealth* v. *Medeiros*, 395 Mass. 336, 351 (1985), quoting from *Commonwealth* v. *Stewart*, 375 Mass. 380, 385 (1978). "Whether evidence is relevant and whether its probative value is substantially outweighed by its prejudicial effect are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error." *Commonwealth* v. *Sylvia*, 456 Mass. 182, 192 (2010). On appeal, the admissibility of evidence is not reviewed de novo. Instead, we may reverse a trial judge's exercise of discretion only when the defendant demonstrates

inflammatory photographic evidence, is analyzed under the same standard. "Bad act" evidence is generally inadmissible if offered to show the defendant as a person of bad character or to show a propensity to commit the offense. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). Such evidence may be admissible, however, if relevant for some other probative purpose, including for the purpose of showing intent, motive, state of mind, or some other relevant issue at trial. See *Commonwealth* v. *Leonard*, 428 Mass. 782, 786 (1999). These determinations are left to the sound discretion of the judge, see *Commonwealth* v. *Marrero*, 427 Mass. 65, 67-68 (1998), whose decision to admit such evidence will be upheld absent palpable error. Where such evidence is relevant, the judge must determine whether its probative value on the issue "outweighs the undue prejudice that may flow from it." *Commonwealth* v. *Helfant, supra* at 225. "To be sufficiently probative, however, the evidence of the prior acts 'must be connected with the facts of the case [and] not be too remote in time.' " *Commonwealth* v. *Delong*, 60 Mass. App. Ct. 528, 534 (2004), quoting from *Commonwealth* v. *Cardarelli*, 433 Mass. 427, 434 (2001). We are not concerned here with the prior bad acts of the defendant or his propensity to commit criminal acts because of prior misbehavior; more precisely, the photographic images on his computer were admitted as relevant to his motive and intent.

[7]The judge stated: "[T]he prior bad act evidence here is certainly prejudicial to the defendant, there's just no doubt about that, but, of course, if it [were not] prejudicial the Commonwealth wouldn't want to introduce it. Here I have to balance the prejudicial aspect to the probative aspect of it. There's a very high probative value to this evidence. . . . The balance, I find, favors the Commonwealth."

"that no conscientious judge, acting intelligently, could honestly have taken the view expressed" by the judge. *Commonwealth* v. *Medeiros, supra* at 351.

On this record, the defendant has not shown that the judge's decision to admit this evidence was an abuse of discretion.[8] Here, the Commonwealth introduced this evidence to prove the defendant's intent to murder by showing the defendant's interest in engaging in asphyxiation with an unknowing partner. The judge properly recognized that he must determine whether the probative value of the evidence is substantially outweighed by the risk of unfair prejudice to the defendant. While he observed

---

[8] Our colleague, in dissent, would hold that the judge abused his discretion because he did not actually view the video clip before admitting it in evidence. We need not reach this issue because first, the defendant has never claimed that it was the failure to view the video or any of the objected-to material that constitutes an abuse of discretion. Second, the defendant neither stated nor suggested to the judge that any particular aspect of the video (or any other item under discussion) needed to be seen in order to properly rule on its admissibility.

Substantively, the judge neither failed to exercise nor abused his discretion in deciding to admit the video without having viewed it. Before trial began, the judge discussed the contents of this material to determine appropriate questions for jury voir dire and immediately thereafter conducted a hearing on the parties' cross motions in limine, during which the Commonwealth and the defendant further discussed in detail the items the Commonwealth sought to have admitted in evidence, namely, images and articles from the defendant's computer, searches performed on the computer, and Web sites visited, as well as the ninety-second video clip on which our dissenting colleague has focused. The prosecutor specifically described the video clip: "[T]he video actually depicts a woman who is seated naked in a chair with a man behind her and is apparently strangled and appears dead at the end of footage." Later, during discussion of the motions in limine, the prosecutor added further description of the video: "The woman's face, you can see stages of blue, red turning to blue, then she's lying with her eyes wide open, not moving, and it certainly is the appearance that she's dead." Both during this discussion, and later in the trial, the judge indicated that he had viewed the photographs that were the subjects of the motions in limine.

Given these discussions and the photographs the judge had viewed, he did not need to also view the video clip to understand what it contained and to then rule on its admission. The judge expressed sufficient understanding of the content and the reasons proffered by the parties for admission or exclusion.

We do not intend to suggest, however, that to admit such evidence without having viewed it sufficiently to understand its contents ought to be a rule rather than an uncommon exception. On our view of the video we are satisfied that the judge had a fair and complete enough description of its contents to make an informed decision and to exercise his discretion.

that all inculpatory evidence is prejudicial, he determined that the evidence was admissible because it was highly probative on the issue of the defendant's motive and intent. Specifically, he determined that the evidence was directly relevant to the defendant's claim of "voluntary sexual activity." See *Commonwealth v. O'Brien*, 432 Mass. 578, 589 (2000) (in a murder case, a newspaper article found on the defendant's bureau dated one month before the murder about three men's fascination with the movie "Natural Born Killers" was admissible as "probative as to the defendant's state of mind"); *Commonwealth v. Guy*, 454 Mass. 440, 441, 443-444 (2009) (evidence that the defendant discussed and read articles and books about serial killers "was relevant to [his] motive and state of mind and to explain what otherwise might be seen as an inexplicable act of violence"). See also *Commonwealth v. Scott*, 408 Mass. 811, 820 n.9 (1990) (court determined the judge did not abuse his discretion in admitting testimony about a magazine article found in the defendant's apartment about a serial killer who gagged and strangled young women, agreeing that it was not unduly prejudicial; "The way in which the serial killer murdered his victims, and the way in which the victim in the instant case died, were sufficiently similar for the testimony to be admitted as evidence of sexual desire and contemplation of modus operandi").

In *Commonwealth v. Wallace*, 70 Mass. App. Ct. 757, 765 (2007), this court opined that photographs of fully clothed young girls at play at various outdoor locations, photographs of nude adult men and women engaged in sexual activity, two pornographic magazines entitled "Pure Eighteen" containing pictures of teenage girls, and small-sized underwear "were properly admitted in evidence. They were substantive evidence of the defendant's voyeuristic interest in sexual matters and young females. On that basis, the exhibits were probative and substantive evidence on the sole question before the jury, that is, whether the defendant intentionally squeezed the victim's breast or accidentally touched her while in the performance of a good deed."

In *Wallace*, this court also had occasion to distinguish *Commonwealth v. Jaundoo*, 64 Mass. App. Ct. 56 (2005), a case relied upon by the defendant in *Wallace* and the defendant in this case. In *Jaundoo*, *supra* at 58, the defendant objected to the

admission of the following evidence: "twenty-one pornographic videotapes, several magazines with pornographic pictures, over one hundred additional pornographic images," and a crystal cup or shot glass emblazoned with pictures of individuals engaged in sexual acts. "Because the large number of exhibits put before the *Jaundoo* jury . . . had little relevance to the complainant's testimony and were concluded to have little probative value, and because it appeared that the judge neither conducted any analysis to determine whether those exhibits were more probative than prejudicial nor gave a sufficiently curative limiting instruction to overcome the prejudicial effect of the large quantity of material shown to the jurors, this court concluded that 'in the circumstances of this case' . . . the court did not have the requisite 'fair assurance' that the judgments were not 'substantially swayed' by the erroneously admitted exhibits." *Commonwealth* v. *Wallace, supra* at 766-767, quoting from *Commonwealth* v. *Jaundoo, supra* at 64.

Unlike *Jaundoo*, the number of exhibits admitted here was limited. The judge conducted a proper analysis weighing the probative value of the evidence against unfair prejudice to the defendant, found the evidence to be highly relevant on the issue of the defendant's intent and the defense of voluntary sexual acts, and gave strong cautionary instructions on four distinct occasions: before any photographs were introduced, when the first three photographs were introduced, when the video clip was played, and in his charge. If the judge recognizes his discretion to consider the issue, and then properly exercises that discretion, we are not free to substitute our judgment to say that we would or would not have done the same if presented with the question. "On appellate review '[t]he question is not whether we . . . should have made an opposite decision from that made by the trial judge.' " *Commonwealth* v. *Medeiros*, 395 Mass. at 351, quoting from *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976). See *Commonwealth* v. *Anderson*, 445 Mass. 195, 209 (2005). The record demonstrates that the judge was aware of the evidentiary issue to be determined, recognized his discretion, and exercised it properly.

*Judgments affirmed.*

GRAINGER, J. (dissenting). I respectfully dissent from the majority's conclusion that a judge can properly ascertain — sight unseen — the prejudicial and probative character of demonstrative evidence. It is axiomatic that the judge's obligation to provide a fair trial to a criminal defendant requires attentiveness to ensure that jury findings are based on proper evidence, properly admitted, and not on what our cases refer to as "inflamed emotions." See *Commonwealth* v. *Berry*, 420 Mass. 95, 109 (1995) ("trial judges must take care to avoid exposing the jury unnecessarily to inflammatory material that might inflame the jurors' emotions and possibly deprive the defendant of an impartial jury").

The defendant objected repeatedly to the admission of the ninety-second video "clip" here at issue.[1] The majority concludes that the defendant nevertheless failed to preserve the issue because he did not also complain during the trial about the manner in which the judge reached his decision. However, we require preservation of error so that the judge has an opportunity to correct potential error, and avoid unnecessary appeal. See *Commonwealth* v. *McDuffee*, 379 Mass. 353, 359 (1979). Here, the judge was fairly placed on notice that admission of the video clip was potential error because it might be significantly more prejudicial than probative.[2] The standard of review is not properly invoked to overlook nonperformance by the judge simply because the judge, specifically alerted to the issue, chose to act on assumption rather than firsthand investigation. He was explicitly asked by the defendant to perform his role as a gatekeeper and did not do so. Cf. *Commonwealth* v. *Bastarache*, 382 Mass. 86, 106 (1980) (affirming admission of inflammatory and altered photographs, noting that in such cases "the judge should carefully assess" them).

I must also differ with my colleagues on the claimed salutary effect of the judge's review of other materials, or his discussions with counsel about the graphic images and the video clip. In blunt terms, ninety seconds is a long time to watch a man

[1]The judge noted on the record that the defendant had preserved the issue.

[2]Even on this record it is clear that the probative value of the video clip was secondary; it had no relevance to the actual crime and went exclusively to state of mind.

strangle a naked woman to death. Second-hand descriptions do not replicate the effect — indeed they do not even tell us what the effect might be. Caricature or imitation may be seriously unsettling depending on the realism with which they portray an unsavory reality. The extent to which this evidence may have prejudiced the jury unfairly is therefore a question of nuance and impression. Alternatively, and far more serious, a so-called "snuff" movie — a filmed record of a real murder — is in an altogether different and far more powerful category when our task is to determine prejudicial effect. Descriptions by lawyers do not provide a substitute for the judge's obligation to observe and experience. Words, albeit our stock in trade, are simply deficient here. The judge was duty bound to observe the proffered evidence, and decide.

The fact that the judge viewed still photographs and other evidence exacerbates the problem in my opinion, because it is the effect of all the admitted evidence that is at issue. An essential aspect of balancing probative value with prejudicial effect is considering cumulative effect; the judge cannot consider each piece of evidence as though the others did not exist. See *Commonwealth* v. *Lawrence*, 404 Mass. 378, 390 (1989) (judge properly excluded photographs "he found cumulative and possibly prejudicial"). See also Mass. G. Evid. § 403 (2011).

The Commonwealth points out that only a small portion of the total materials found on the defendant's computer was admitted. The obvious corollary is that there was good reason for drastic editing. Materials of this nature must be carefully selected to ensure that prejudicial material, even assuming probative value, is not needlessly repetitive.[3] Our viewing confirms that both the photographs and the clip are highly realistic and inflammatory by any conventional standard. In such a case there is a point at which the probative value of the additional inflammatory evidence is reduced or eliminated. The judge could not determine whether this was so, or where that point might be found, because he did not examine the video clip.

A judge has no discretion whether to exercise discretion;

---

[3] *Commonwealth* v. *Jaundoo*, 64 Mass. App. Ct. 56, 63 (2005) (reversible error to admit "great quantity of [sexual] materials, much of which had no direct bearing on the complainant's testimony").

failure to do so is treated as a variant of abuse of discretion, hence error, by our cases. *Commonwealth* v. *Fredette*, 56 Mass. App. Ct. 253, 259 n.10 (2002). See *Commonwealth* v. *Manning*, 47 Mass. App. Ct. 923 (1999). I fully endorse the general applicability of the cases cited by the majority in its comprehensive decision, and especially those that speak to the trial judge's broad discretion. None of them, however, addresses a failure to look at demonstrative evidence after the defendant has objected to its admission, suggesting that this instance is unusual.[4]

For the reasons set forth above I conclude the error was prejudicial. Simply stated, it deprived the defendant of the judge's obligation to determine independently whether the passions of the jury would be inflamed to a degree that outweighed the probative value of evidence indicating only a propensity to commit the crime.

The convictions should be vacated and the case remanded for proceedings which include a proper basis for evidentiary rulings.

---

[4]See, e.g., *Commonwealth* v. *Petrillo*, 50 Mass. App. Ct. 104, 107 (2000), cert. denied, 532 U.S. 1030 (2001) (harmless error in admission of portion of videotape after "the judge observed the videotapes").