## COMMONWEALTH *vs.* BRIAN J. WALLACE.

No. 06-P-672.

Barnstable. November 14, 2006. - November 29, 2007.

Present: PERRETTA, COWIN, & MILLS, JJ.

*Indecent Assault and Battery. Constitutional Law,* Search and seizure. *Search and Seizure,* Motor vehicle, Consent, Impoundment of vehicle. *Evidence,* Relevancy and materiality.

A District Court judge properly denied the criminal defendant's motion to suppress evidence discovered during a search of his motor vehicle, where the police acted properly in impounding the vehicle, which was illegally parked in a space reserved for handicapped persons and which was left unattended when the defendant agreed to accompany the police to the police station [762-763], and where the defendant, who was not in custody, voluntarily consented to the search of his vehicle [763-764]. MILLS, J., concurring.

At the trial of a criminal complaint charging the defendant with indecent assault and battery on a child under fourteen years of age, the defendant did not suffer prejudice from the admission in evidence of items seized from his motor vehicle, where one group of items (consisting of photographs of fully clothed young girls at play at various outdoor locations, photographs of nude adult men and women engaged in sexual activity, two pornographic magazines that contained pictures of teenaged girls, and small-sized underwear) constituted probative and substantive evidence of the defendant's voyeuristic interest in sexual matters and young females [764-766], and where, even assuming that a second group of items (consisting of lubricant found in the glove compartment of the defendant's vehicle, as well as a knife, some rope, and some duct tape taken from the trunk of the vehicle) was of no relevance to the crime charged and was erroneously admitted in evidence, the judgment was not substantially swayed by the error [766-770]. MILLS, J., dissenting.

COMPLAINT received and sworn to in the Barnstable Division of the District Court Department on August 8, 2005.

A pretrial motion to suppress evidence was heard by *Joan E. Lynch*, J., and the case was tried before *H. Gregory Williams*, J.

The case was submitted on briefs.

*Russell J. Redgate* for the defendant.

*J. Thomas Kirkman*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On appeal from his conviction by a District Court jury on a complaint charging him with indecent assault and battery on a child under fourteen years of age, see G. L. c. 265, § 13B, the defendant claims that evidence was illegally seized from his motor vehicle and thereafter put before the jury notwithstanding the fact that its potential for prejudice far outweighed its probative value. We conclude that the defendant consented to the search of his vehicle and that the seized evidence was admissible to show his sexual intent, predatory motive, and intentional rather than accidental touching of the victim, and we affirm the judgment.

1. *The evidence at trial.* At about 11:00 A.M. on July 27, 2005, the twelve year old victim, her mother, and three family friends were preparing to leave a hotel after a short vacation. Both the victim's mother and another woman were in wheelchairs. As the group was making trips back and forth to the vehicle, the defendant approached the victim and asked if she needed help carrying suitcases. He then followed the victim to a patio area that could not be seen from the parking lot because of surrounding shrubbery.

While in the patio area, the defendant engaged the victim in conversation, asking if he could pet or rub the stuffed animal she was holding. When the victim acquiesced to the request, the defendant asked if he could rub her. The victim said no, but the defendant reached for her and squeezed her right breast. He then walked away, telling the victim, "Don't tell anyone. You made my day."

Within two minutes, the visibly upset victim found her mother and told her what had happened. The mother notified hotel personnel, and the police were summoned to the scene. The defendant was nowhere to be found. At the request of the police, the victim and her mother went to the police station, where a sketch artist drew a picture of the suspect based on information they provided. About one week later, they returned to the police station, where they were separately shown an array of eight photographs that included the defendant's picture. The victim

and her mother each selected the defendant's photograph as depicting the man they had seen in the hotel parking lot.

Items taken from the defendant's car about one week after the incident were put in evidence over objection, his motion to suppress having been denied prior to trial. Photographs of young girls, pictures from a pornographic magazine, and a tube of KY lubricating jelly were found in the glove compartment. In the trunk of the car, in the space where a spare tire would be stored, the police found two small pairs of girls' or women's panties and bras, a plastic bag containing approximately twenty Polaroid photographs of different young girls at various outdoor locations, photographs of partially and fully nude adult women and men engaging in oral sex, a Polaroid camera, condoms, clothesline, duct tape, a ten-inch steak knife, two tubes of KY jelly, and two pornographic magazines entitled "Pure Eighteen."

The defendant testified that as he was returning to his car parked in the hotel parking lot, he saw the victim struggling with suitcases and noticed that two of the adults with her were in wheelchairs. He offered his help to the victim, she accepted, and he loaded her suitcases into her car. As he was about to leave, he spoke briefly with the victim and petted the stuffed animal she was carrying. He denied touching her or making any inappropriate statements. As for the physical evidence, the defendant acknowledged that the items put in evidence were taken from his vehicle. He stated that although the Polaroid camera was his, he did not take most of the photographs found in the trunk. The knife, lubricant, and duct tape were his, but he was "ninety percent sure" that the underwear belonged to his wife.

In his closing argument, defense counsel argued that the defendant had done nothing wrong and that even had he touched the victim's breast, the touching was accidental.

2. *The evidence at the hearing on the motion to suppress.* In denying the defendant's motion to suppress, the judge stated only, "The defendant executed a written consent form; based on the credible evidence presented at the hearing . . . the motion is denied." Although the judge made no specific findings of fact, the relevant facts are not in dispute. Thus, "we are in as

good a position as the [motion] judge to determine the legal significance of those facts." *Commonwealth* v. *Carrington*, 20 Mass. App. Ct. 525, 526 (1985). See *Commonwealth* v. *Kipp*, 57 Mass. App. Ct. 629, 630 (2003).

After a composite sketch of the victim's assailant was produced, Barnstable police Detective John York showed the sketch to numerous people in the area of the crime. Linda Rose, one of the people to whom he spoke, informed York that she had seen some items in a vehicle, pictures of young girls playing and walking in parks, and "some nude pictures, but not of little girls," that "in her opinion . . . could be related to the incident." About one week later, Rose called the police and reported that a man she thought resembled the individual depicted in the sketch was sitting in a brown Honda automobile that was parked in a handicap parking space in the Salvation Army parking lot.

York responded to Rose's call and arrived on the scene on a fully marked police motorcycle. The motorcycle unit was responsible for all traffic enforcement. York spoke briefly with Rose, who was standing to the rear of the vehicle, and he then walked to the Honda. He saw that the defendant was seated, alone, in the driver's seat and that there was neither a license plate nor a placard on the dashboard or hanging from the rearview mirror to indicate that the driver had the right to occupy a handicap parking space. As he spoke to the driver and asked for his identification, York noticed that he bore a strong resemblance to the man depicted in the composite sketch. He informed the defendant of his resemblance to the composite sketch of a man the police were investigating and asked if he would be willing to go to the police station and speak with officers conducting the investigation. When the defendant agreed to do so, York summoned a police cruiser to the parking lot. The defendant got into the cruiser and was taken to the police station.

As the defendant was being transported to the police station, York remained behind to speak briefly with Rose and to call for a tow truck to impound the defendant's vehicle. York explained that he usually arranged for a vehicle parked in a handicap zone to be towed rather than issuing a ticket, and that the towing of the defendant's vehicle was consistent with the police depart-

ment's written protocol.[1] Upon the tow truck's arrival, York followed it to the police station and waited as the defendant's car was unhooked from the tow truck and left in the station's back lot. Once the vehicle was secured, York went into the station and located the defendant and Barnstable police Detective Reid Hall, the officer in charge of the investigation.

Hall told York that he had informed the defendant why he was at the police station and the nature of the incident involving the indecent assault and battery on the victim. York then advised the defendant of his Miranda rights, after which the defendant signed a form in which those rights were explained in detail. He then asked to speak with an attorney. Although the defendant was given an opportunity to use a telephone in Hall's office, there is nothing in the record before us to show that he availed himself of that opportunity.[2]

After an interval of about ten minutes, during which there was no conversation between the defendant and York or Hall, York informed the defendant that his vehicle was at the police station and asked the defendant if he would consent to a search of his vehicle. In response to the defendant's inquiries, York explained that the police wanted to search the car for evidence that could be related to the incident described to the defendant by Hall. When the defendant indicated his reluctance to the search because he "did [n]ot want his wife to know what was in his car," York assured the defendant that he had no intention

---

[1] Although the defendant disputes that the towing of his vehicle was consistent with police department policy, he failed to offer that policy in evidence at the hearing on the motion to suppress and instead presented a memorandum in which he offered his understanding of the policy.

[2] In any event, the defendant makes no argument with respect to his invocation of his right to counsel made about ten minutes prior to the request for his consent to search his car. Although it is beyond dispute that once a suspect invokes his right to counsel police may not conduct further custodial interrogation, see *Edwards* v. *Arizona,* 451 U.S. 477, 484-485 (1981), that principle is inapplicable in the instant case. The undisputed facts show that the defendant was not in custody when the police requested his consent to search his car. See *Commonwealth* v. *Girouard,* 436 Mass. 657, 665 (2002); *Commonwealth* v. *Barnes,* 20 Mass. App. Ct. 748, 752 (1985). Even were he in custody, the result would be no different. "The overwhelming weight of authority is that a police request for consent to search from an individual in custody is not custodial interrogation for purposes of *Miranda* v. *Arizona,* 384 U.S. 436 (1966). See 4 LaFave, Search and Seizure § 8.2(j), at 116-117 (4th ed. 2004)." *Commonwealth* v. *Costa,* 65 Mass. App. Ct. 227, 233 n.8 (2005)

of revealing the details of any search to the defendant's wife. The defendant then signed a form in which he acknowledged his consent to the search of his vehicle.[3]

3. *Discussion.* Because the items taken from the defendant's car were put in evidence, we take up first the defendant's argument that his motion to suppress was erroneously denied, and then his claim that the items found should have been excluded from evidence at his trial.

a. *The motion to suppress.* It is the defendant's argument that his consent to the search of his car was the product of the vehicle's illegal seizure, and consequently, the evidence discovered in the search was tainted and should have been suppressed. See *Commonwealth* v. *Midi,* 46 Mass. App. Ct. 591, 595 (1999) (when consent obtained through "exploitation" of prior illegality, consent not freely given, especially where consent close in time to illegality).

It was the Commonwealth's burden to show that the defendant's consent to the search of his vehicle was freely and voluntarily given, that is, his consent was "unfettered by coercion, express or implied." *Commonwealth* v. *Krisco Corp.,* 421 Mass. 37, 46 (1995), quoting from *Commonwealth* v. *Harmond,* 376 Mass. 557, 561 (1978).

Whether the defendant's consent to the search of his vehicle was voluntarily given is a question to be resolved on the basis of the totality of circumstances existing at the time of the consent. See *Commonwealth* v. *Aguiar,* 370 Mass. 490, 496 (1976); *Commonwealth* v. *Heath,* 12 Mass. App. Ct. 677, 680 (1981); *Commonwealth* v. *Costa,* 65 Mass. App. Ct. 227, 231 (2005). Consent will be held to be valid "if it can rationally be determined that it did not come about by virtue of [a] prior illegality, but rather was given for reasons independent of the earlier unlawful

_____

[3]That form reads, in full:

"I grant permission for a complete search of the passenger compartment; and I consent to the search of entire vehicle, including the trunk and any or all luggage, packages, or containers that may be found in the vehicle.

"I fully understand that I do not have to consent to this search. No threats or force were used by any members of the Barnstable Police Department in order to obtain my consent. I grant this permission to search my vehicle freely and voluntarily."

act or event." *Commonwealth* v. *Kipp*, 57 Mass. App. Ct. 629, 633 (2003).

The defendant's argument is unsupported by the law and the undisputed facts. We consider first the law relating to the impoundment of the defendant's vehicle. "Car impoundments may be justified under the community caretaking function if the car is disabled, or illegally parked, or is impeding traffic." *Commonwealth* v. *Brinson*, 440 Mass. 609, 615 (2003). The community caretaking function extends to vehicles located in privately owned commercial lots that are illegally parked. See *Commonwealth* v. *Delong*, 60 Mass. App. Ct. 528, 537 (2004).

As for the circumstances of the defendant's consent, we begin with the undisputed fact that the physically able defendant was seated in his vehicle, which was illegally parked in a space reserved for handicapped persons, a space that he was not entitled to occupy. When he agreed to accompany the police to the police station, the illegally parked vehicle was left unattended. Moreover, York testified that upon his arrival at the parking lot, he was concerned about the location of the vehicle and the investigation of the crime in issue. He also testified that cars illegally parked in a space reserved for handicapped drivers are typically towed. Based on these circumstances, which establish that the defendant agreed to accompany the police to the police station without moving his car or suggesting an alternative means of its removal,[4] we conclude that the police could lawfully tow and impound the vehicle.

Apart from the timing of his consent, there is no circumstance indicative of any connection between the defendant's consent and the impoundment of his vehicle. Moreover, the defendant was not himself subjected to any illegality when the police sought his consent. Contrast *Commonwealth* v. *Loughlin*, 385 Mass. 60, 62-63 (1982) (consent tainted by illegal detention of motorist); *Commonwealth* v. *Yehudi Y.*, 56 Mass. App. Ct. 812, 818 (2002) (consent not freely given where police obtained consent in home after illegal entry). Rather, when the defendant consented to the search of his vehicle, he was voluntarily at the

---

[4]The undisputed evidence more than supports the reason for the defendant's reluctance to contact his wife and ask for her assistance in removing the vehicle prior to its towing and impoundment.

police station, his car was in the police station lot, and he was free to leave. Moreover, the defendant knew and understood that he had a right to refuse consent, see note 3, *supra,* and the police never stated or suggested that they would obtain a search warrant if he refused consent. Cf. *Commonwealth* v. *Hinds,* 437 Mass. 54, 57 n.1 (2002), cert. denied, 537 U.S. 1205 (2003), quoting from *Commonwealth* v. *Harmond,* 376 Mass. at 561 ("it is inconclusive on the question of voluntariness that the police announced their intention to seek a search warrant if consent were not forthcoming").

On the basis of the circumstances surrounding the defendant's consent to the search of his vehicle, we conclude that he freely and voluntarily gave permission for the search and that his motion to suppress was correctly denied.

b. *The probative value of the seized evidence.* It does not necessarily follow that because the items from the defendant's car were legally seized, they were admissible in evidence. The defendant objected at trial to the admissibility of the seized items on the basis that their possession was not illegal and that their probative value was far outweighed by their potential for prejudice.[5] His argument on appeal is the same. He claims that the probative value of the items taken from his car and admitted in evidence was outweighed by their potential for prejudice and, consequently, his conviction must be reversed.

"Evidence is relevant if it has a 'rational tendency to prove an issue in the case,' *Commonwealth* v. *LaCorte,* 373 Mass. 700, 702 (1977), or render a 'desired inference more probable than it would be [otherwise].' *Commonwealth* v. *Fayerweather,* 406 Mass. 78, 83 (1989)." *Commonwealth* v. *Arroyo,* 442 Mass. 135, 144 (2004). It "need not establish directly the proposition sought; it must only provide a link in the chain of proof." *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 744 (1990), quoting from *Commonwealth* v. *Tobin,* 392 Mass. 604, 613 (1984). Evidence of a defendant's predisposition to commit the crime charged has long been held to be relevant. See *Commonwealth* v. *Bemis,* 242 Mass. 582, 585 (1922); *Commonwealth* v. *King,* 387 Mass. 464, 470 (1982); *Commonwealth* v. *Dwyer,* 448 Mass.

---

[5]Our reading of the transcript indicates that the defendant did not object to the admissibility of the seized camera or condoms.

122, 128-129 (2006); *Commonwealth* v. *LaSota*, 29 Mass. App. Ct. 15, 25 (1990). Judges are afforded "great latitude and discretion" in determining whether any prejudicial effect that the proffered evidence might have on a jury is outweighed by its probative value. *Commonwealth* v. *Arroyo, supra.*

We separate the items taken from the defendant's car into two groups. The first group consists of the photographs of fully clothed young girls at play at various outdoor locations, the photographs of nude adult men and women engaged in sexual activity, two pornographic magazines entitled "Pure Eighteen" which contained pictures of teenage girls, and the small-sized underwear. The second group is comprised of the lubricant found in the glove compartment of the defendant's car and the knife, rope, and duct tape taken from the trunk. For purposes of decision, we assume that the defendant's objections to the admissibility of the exhibits in both groups were sufficient to entitle him to review of his claim under a prejudicial error standard.[6] See *Commonwealth* v. *Jaundoo*, 64 Mass. App. Ct. 56, 60 (2005).

We are of the opinion that all the exhibits in the first group were properly admitted in evidence. They were substantive evidence of the defendant's voyeuristic interest in sexual matters and young females. On that basis, the exhibits were probative and substantive evidence on the sole question before the jury, that is, whether the defendant intentionally squeezed the victim's breast or accidentally touched her while in the performance of a good deed.[7]

To be sure, these exhibits were prejudicial to the defendant in that they had a strong tendency to dispel any notion that the young victim's allegation was attributable to a sexual naivete leading her to misconstrue his claimed accidental act. Any prejudice caused the defendant by reason of these exhibits was

---

[6]The Commonwealth offered a collection of miscellaneous papers, including the registration to the vehicle, to establish the defendant's ownership of the car. The defendant did not object to the admissibility of these papers.

[7]To the extent that the dissent views some of the exhibits that we have included in this group as "marginally relevant" and having an "attenuated" connection to the crime charged (see *infra* at 772), we conclude that these items fall within the broad range of discretion afforded the judge, see *Commonwealth* v. *Arroyo*, 442 Mass. at 144, and that our inclusion of them in the first group is appropriate.

no greater than that which usually flows from probative adverse evidence and was not undue.

Turning our attention to the exhibits in the second group (the lubricant found in the glove compartment and the knife, rope, and duct tape taken from the trunk), we will assume for purposes of decision that these exhibits were of no relevance to the crime charged and were erroneously admitted in evidence. This assumption requires us to consider whether we are nonetheless able to conclude with "fair assurance . . . that the judgment was not substantially swayed by the error." *Commonwealth* v. *Jaundoo*, 64 Mass. App. Ct. at 64, quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). The dissent regards *Jaundoo* as pertinent and controlling authority requiring reversal of the defendant's conviction, while we are of the view that factual and procedural differences between the case before us and *Jaundoo* render that case inapposite.

We relate the facts on which *Jaundoo* is based. There the defendant was tried on indictments charging him with five counts of rape of a child by force and four counts of indecent assault and battery on a child under the age of fourteen. *Jaundoo*, 64 Mass. App. Ct. at 57. At the time of the alleged acts, the defendant was living with the mother and her eight year old daughter, the complainant, in the mother's home. *Ibid.* The complainant's allegations came to the attention of the authorities when she reported these incidents to her fellow students. *Ibid.* There followed a police interview of the defendant during which he denied the complainant's allegations of his crimes against her as well as showing her or possessing any pornographic materials in the home. *Id.* at 58. In executing a search warrant of the mother's residence, the police recovered twenty-one pornographic videotapes, several magazines with pornographic pictures, over one hundred additional pornographic images, and a crystal cup or shot glass emblazoned with pictures of individuals engaged in sexual acts. *Ibid.*

Because the large number of exhibits put before the *Jaundoo* jury, see *id.* at 58 & n.2, had little relevance to the complainant's testimony and were concluded to have little probative value, and because it appeared that the judge neither conducted any analysis to determine whether those exhibits were more proba-

tive than prejudicial nor gave a sufficiently curative limiting instruction to overcome the prejudicial effect of the large quantity of material shown to the jurors,[8] this court concluded that "*in the circumstances of this case,*" *id.* at 61 (emphasis supplied), the court did not have the requisite "fair assurance" that the judgments were not "substantially swayed" by the erroneously admitted exhibits. *Id.* at 64. Consequently, the court reversed the defendant's convictions.

Because we have concluded that the judge did not abuse his discretion in admitting the exhibits in the first group, we confine our analysis of the defendant's claim of undue prejudice to the assumed erroneously admitted four exhibits in the second group to determine whether his conviction must be reversed. We start with the undisputed and established facts in the instant case which we think are decisively dissimilar from those in *Jaundoo, supra.*

In the present case, the victim and the defendant were strangers. Consistent with the victim's testimony, which was corroborated by her mother's testimony, the victim made an almost instantaneous first complaint to her mother that led to an immediate search of the area and a call for police assistance. The victim's description of the man who assaulted her, and the mother's description of a man she had seen in the hotel parking lot, resulted in a composite sketch that led to the defendant's arrest. The victim and her mother individually selected photographs of the defendant from an array of eight.

The arguments made in the present case on pretrial motions, as well as the many objections taken and considered throughout the trial, never changed. The judge well understood both the basis of the prosecutor's offer, that the items were relevant and probative of the defendant's intent and his claim of accident, and the defendant's objections, that it was not illegal to possess any of the items offered for evidence and that probative value of each of the offered items was outweighed by its potential for

---

[8]As described in *Jaundoo*, 64 Mass. App. Ct. at 60, the judge's limiting instruction was to the effect that "the evidence was being offered not to prove that the defendant was a bad person or a possessor of pornography, but rather to corroborate the complainant's testimony, if the jury concluded that it did so."

prejudice. Compare *Jaundoo*, 64 Mass. App. Ct. at 63.[9] More-
over, defense counsel not only declined the judge's invitation to
be heard on his objection to the admissibility of the exhibits in
the second group, we can find nothing in the record before us to
show that a limiting instruction was sought as to any exhibit in
either the first or second group.[10]

Our understanding of the dissent is that it rests on concerns
about the quantity of exhibits put before the jury and that the
exhibits in the second group carried the implication that the
defendant intended to kidnap and rape the victim or another.
These concerns do not dissuade us from our conclusion for the
following reasons.

The total number of exhibits put before the jury in the instant
matter was far less than those at issue in *Jaundoo*, 64 Mass.
App. Ct. at 58 n.2. Of the total number of exhibits at issue in
the case before us, we have concluded that all but the four
exhibits in the second group were relevant, probative, and
substantive evidence. In his final instructions to the jury, the
judge advised them that "quite a number of exhibits . . . will
be going back to the jury deliberation room with you." In so
doing, he immediately went on to say:

> "[T]he quality or strength of the proof is not determined
> by the sheer volume of evidence or the number of witnesses.
> It is the weight of the evidence, its strength in tending to
> prove the issue at stake that's important."

As for the concern that the exhibits in the second group car-
ried the implication that the defendant intended to kidnap and

---

[9]There the court stated:

> "There is no evidence that the judge, at the time he ruled on the
> admissibility of the bulk of the material, conducted the analysis neces-
> sary to determine whether the probative value exceeded the risk of
> inflaming the jury, especially after his having initially described some
> of the material as 'so fraught with prejudicial effect that the probative
> value is outweighed by the prejudicial effect.' "

*Jaundoo*, 64 Mass. App. Ct. at 63.

[10]In any event, such an instruction would have been inappropriate as to the
first group of exhibits in view of their substantive value on the question of
intent and, we will assume, insufficient to cure any prejudice flowing from the
inadmissible exhibits in the second group.

rape the victim or another and thereby influenced the verdict, we conclude that any such implication or other concern about undue prejudice from the exhibits in the second group was more than dispelled by the conduct of the trial proceedings and the exhibits in the first group.

The judge made it clear from his initial instructions to the jury that the complaint before them concerned one issue, whether the defendant intentionally and indecently touched a child under the age of fourteen years. There followed the prosecutor's opening statement in which he set out the evidence that would support the allegation of an intentional rather than accidental touching. In so doing, he made only a fleeting reference to the photographs as they might relate to the element of intent. He made no reference to any other exhibits.

We are also of the opinion that the prosecutor's cross-examination of the defendant was narrow and restrained. When questioned about the photographs of the young girls at play and the small-sized underwear, the defendant stated that the photographs were taken by his niece and nephew and that the small-sized underwear most probably belonged to his wife. The prosecutor's closing argument was far from inflammatory.

From start to finish, defense counsel repeatedly pointed out that it was not illegal to possess any of the items taken from the defendant's car and argued that any touching of the victim by the defendant, if such a touching occurred, was no more than an accidental act that occurred as he was helping her with her luggage. The prosecutor made no mention of the exhibits in the second group in his closing argument. Rather, any mention of the exhibits was confined to those in the first group and pertained to the defendant's explanation for their possession.

In his final charge to the jury, the judge again made it clear that an element of the crime before them required that they conclude beyond a reasonable doubt that any touching of the victim was intentional rather than accidental.

We can find nothing in the sole count of the complaint brought under G. L. c. 265, § 13B, the judge's initial and final instructions to the jury, the opening statements and closing arguments of the prosecutor and defense counsel, or the testimony of the victim *or* the defendant that supports any concern that in con-

sidering the divergent theories of guilt or lack thereof, the jury disregarded the judge's instructions and, instead, engaged in speculation whether the defendant intended to kidnap the victim or another. Cf. *Commonwealth* v. *Anderson*, 445 Mass. 195, 214 (2005) ("[T]he judge instructed the jury that although they heard evidence concerning other acts by the defendant, he was not charged with those acts and they could not use any of those acts as proof that he committed the crimes with which he was charged. Juries are presumed to follow a judge's instructions").

To recapitulate: notwithstanding the fact that the exhibits in the second group, assumed to be inadmissible, were before the jury during their deliberations, we conclude that in the circumstances of this case, we have the requisite fair assurance that the verdict was not swayed, substantially or otherwise, by those four exhibits.

*Judgment affirmed.*

MILLS, J. (concurring in part and dissenting in part). I concur with the majority that the motion to suppress was properly denied. However, I respectfully dissent from the majority's conclusion that the evidence taken from the defendant's car was properly admitted. That evidence was described to the jury by Detective John York, who testified that from the glove compartment he retrieved "several miscellaneous photographs of . . . young girls," a tube of KY lubricating jelly, and photographs that he described as a page torn out of a pornographic magazine. These materials became exhibit 4. After testifying that nothing was located in the rest of the car's interior, York described what he found in the trunk: (a) "several pornographic magazines. Teens. Eighteen year-old-girls[,] . . . [and] depicting nude women"[1]; (b) "two pairs of girls — young girls small panties

---

[1]The two magazines are in full color with little or no text. One of the magazines contains more than 500 full-color pictures, most of completely nude females in various erotic positions, and showing female genitalia, and various sexual poses. In addition to the photographs, the magazine contains dozens of sexual advertisements with telephone numbers. The second magazine is similar and contains approximately ninety pages of photographs, and about

. . . [and a] bra"[2]; (c) five Polaroid photographs, four of which depicted small children: (i) two small girls walking down a sidewalk, (ii) "a small girl, thin, eight, nine years old sitting on a swing," (iii) "two girls behind a chain link fence," (iv) four or five young children at a school bus stop in Hyannis, and (v) (apparently not showing children) a wooden area overlooking a pond[3]; (d) twenty Polaroid photographs depicting "older women. Some of them in full nudity, some of them partial nudity and topless, and some of them engaging in oral sex on a male subject," which were found in the same plastic bag with the previous five photographs[4]; (e) a Polaroid Instamatic camera[5]; (f) a length of clothesline rope, a roll of duct tape, a ten-inch steak knife, and two more tubes of KY lubricating jelly[6]; and (g) miscellaneous papers, including a vehicle registration with the defendant's name on it.

For purposes of analysis, the majority separates the items taken from the defendant's car into two groups. The first group consists of the photographs marked 7A through 7E; those marked 8A through 8T; the two magazines marked, collectively, as exhibit 6; and the small-size underwear. The second group comprises the single tube of lubricant taken from the glove compartment, as well as the knife, rope, and duct tape retrieved from the trunk.[7]

ten pages of text. Those photographs (and the advertisements) are in full color, and the second magazine also contains numerous advertisements for sexual services and pay-per-call telephone numbers for personal sexual services and erotic sexual conversation.

[2]These items appear to have been marked exhibit 5.

[3]These Polaroid photographs were marked exhibits 7A through 7E.

[4]These photographs were marked exhibits 8A through 8T. Eight of the photographs depict women performing oral sex on an unidentifiable male body. In three of the photographs two separate women are shown topless, and in three of the photographs three women are shown, front profile, completely nude. From what appears, all twenty-five of the photographs (exhibits 7A through 7E, and 8A through 8T) are the identical type of Polaroid picture.

[5]The camera became exhibit 9. There was no testimony that explicitly linked the twenty-five Polaroid exhibit pictures with this particular Polaroid camera, but the inference seems unavoidable that the defendant used his camera to take the Polaroid pictures.

[6]These items, together with the tube of jelly taken from the glove compartment, were marked exhibit 10, as a group.

[7]I assume that the two additional tubes of lubricant are included in the

If the "several miscellaneous photographs of . . . young girls" included in exhibit 4, the panties included in exhibit 5, and the Polaroid photographs marked as exhibits 7A through 7E, with the Polaroid camera, were the only evidence admitted in this case, there could be no successful objection on the grounds of relevance and potential prejudice. See *Commonwealth* v. *Arroyo*, 442 Mass. 135, 144 (2004). However, the remaining evidence, in my view, is too attenuated to be relevant.

Even if some or all of that evidence were marginally relevant, the prejudice to the defendant, for the single charged offense, is overwhelming. The evidence was retrieved during a single search, from a single car, and admitted with the testimony of a single witness.[8] The evidence, in total, was sent to the jury with the judge's instruction that the evidence be considered "as a whole."[9] In my view, the impermissibly prejudicial evidence in the second group, taken with the inadmissible evidence from the first group, tainted those fewer pieces of evidence from the first group that might have otherwise survived objection. The duct tape, rope, and knife are the customary tools of the kidnapper and rapist — why else would these materials have been offered as exhibits? This was, however, a single count of indecent assault, upon the young girl's complaint that the defendant had squeezed her right breast in circumstances where her mother and three other friends were in close proximity. The contested evidence did not go to a central issue in the case, see *Gath* v. *M/A-Com, Inc.*, 440 Mass. 482, 489-491 (2003). For these

second group. The camera and condoms are placed in neither group, and the majority reads the transcript as indicating that the defendant did not object to the admission of these items. In my view these items, or at least the testimony describing these items, were the subject of sufficient objection.

[8]All twenty-five Polaroid photographs were, when found, together as a group in the same plastic bag, and the jurors were so informed. All of the photographs are of identical Polaroid type, and when presented with the camera, would undoubtedly give the impression that all of the photographs (which I will not describe again) were taken by the defendant (Why else would the camera have been seized and described in the testimony?).

[9]The judge instructed the jury: "We have quite a number of exhibits that will be going back to the jury deliberation room with you. . . . Now, of course, the quality or strength of the proof is not determined by the sheer volume of evidence or the number of witnesses. It is the weight of the evidence, its strength in tending to prove the issue at stake that's important. . . . Consider the evidence as a whole."

reasons, I conclude that it was an abuse of discretion to admit the evidence. See *Commonwealth* v. *Jaundoo*, 64 Mass. App. Ct. 56 (2005).

The majority notes several reasons why this case is distinguishable from *Jaundoo*.[10] Additionally, the majority suggests that any prejudice to the defendant here was mitigated because there was no explicit mention of rape or kidnapping in this case; the judge instructed the jury that the issue in this case was the defendant's intent with respect to the touching; and prosecutorial cross-examination of the defendant was restrained.

Again, with respect to the majority, I do not consider *Jaundoo* distinguishable, or that the prejudice to the defendant was otherwise sufficiently mitigated. I would therefore reverse.

---

[10]The victim and defendant were strangers here, while in *Jaundoo* they were not, see 64 Mass. App. Ct. at 57; the victim here made immediate complaint, compare *ibid.*; composite sketch and photographic identification procedures were used in this case, but were unnecessary in *Jaundoo*; the theory of admissibility of the questioned evidence changed during the progress of the *Jaundoo* trial, see *id.* at 58-60, 62, but remained fairly consistent in this case; some limiting instructions were requested and given in *Jaundoo*, *id.* at 59, but not so here; and the number of exhibits is less in this case, compare *id.* at 58 n.2.